TIMMINS SOFTWARE CORPORATION d/b/a
MITREND

       Plaintiff,

  v.

EMC CORPORATION, DELL TECHNOLOGIES
INC., and DELL INC.

       Defendants.

C.A. No.  1:19-12053-IT

**JURY TRIAL DEMANDED**

**Leave to file granted on 1/15/21
(Dkt. No. 78)**

## SECOND AMENDED COMPLAINT

This is an action for copyright infringement, violation of the Digital Millennium

Copyright Act (the "DMCA"), unjust enrichment, breach of contract, and unfair competition in

violation of both the Lanham Act (15 U.S.C. § 1125(a)) and Massachusetts General Laws

Chapter 93A, in which plaintiff Timmins Software Corporation d/b/a Mitrend ("TSC" or

"Plaintiff") makes the following allegations against EMC Corporation, Dell Technologies Inc.,

and Dell Inc. (collectively, "Defendants").

## THE PARTIES

1.     Plaintiff Timmins Software Corporation is a Massachusetts corporation with a

principal place of business at 225 Cedar Hill Street, Suite 200, Marlborough, Massachusetts

01752.  At times, TSC has done business under the name "Mitrend" (and does so today).  All

references to TSC in this Second Amended Complaint include and incorporate Mitrend.

2.     Upon information and belief, defendant EMC Corporation is a Massachusetts

corporation with its principal place of business at 176 South Street, Hopkinton, Massachusetts

01748, and may be served through its registered agent, Corporation Service Company, 84 State

Street, Boston, Massachusetts 02109.  At all relevant times, EMC was (and is) physically located, and conducts substantial business, in Massachusetts.  Upon information and belief, EMC is a wholly owned subsidiary of Dell Technologies Inc.  All references to "EMC" in this Second Amended Complaint includes and incorporates Dell Technologies Inc. and Dell Inc. post-acquisition of EMC Corporation.

3.      Upon information and belief, defendant Dell Technologies Inc. is a Delaware corporation with a principal place of business at One Dell Way, Round Rock, Texas 78682 and may be served through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

4.      Upon information and belief, defendant Dell Inc. is a Delaware corporation with a principal place of business at One Dell Way, Round Rock, Texas 78682 and may be served through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.  Upon information and belief, Dell Inc. is a wholly owned subsidiary of Dell Technologies Inc.

## JURISDICTION AND VENUE

5.      This action arises under 17 U.S.C. § 101, *et seq.*, 15 U.S.C. § 1121, *et seq.*, and common law.  The court may rule on violations of 17 U.S.C. § 1202 pursuant to 17 U.S.C. § 1203.

6.      This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

7.      This Court has personal jurisdiction over Defendants because, directly or through intermediaries, each has committed acts within the District giving rise to this action, this action arises out of Defendants' contacts with this District, and EMC resides, maintains its headquarters

and offices, and conducts business in this District. In addition, the parties' agreements at issue in this case state that jurisdiction for any litigation "shall exclusively be in Massachusetts."

8.  Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1400, as well as under the parties' agreements at issue in this case, which state that venue for any litigation "shall be exclusively in Massachusetts." As described below, a substantial portion of the events or omissions that give rise to the claims occurred in Massachusetts.

## FACTUAL BACKGROUND

### TSC and its Business

9.  Founded in 2004, TSC is a small, Massachusetts-based company employing fewer than 15 full-time employees. TSC's sole product is the Mitrend® platform, having invested over 13 years of investment into Mitrend's® software, services, marketing, and customer education.

10.  TSC develops software and solutions to help businesses understand their IT infrastructure. TSC's mission is to simplify IT requirements analysis in order to reduce the time, complexity, and uncertainty involved with IT decision making. This mission was derived from a key observation that the market lacked a clear data collection and analysis solution that was robust, but was also easy to use, automated, and delivered quick insights. Such insights help technology company sales organizations better identify sales opportunities for software, products and/or services that improve their customer's IT infrastructure and performance.

11.  TSC's products and services are comprised of two parts. First, TSC developed the Mitrend® Collection Tools that are a combination of software, instructions, and procedures that are provided to IT departments (usually via a technology company customer of TSC's) to acquire information about their IT systems. The term "Mitrend Collection Tools," as used in this Second Amended Complaint, includes, but is not limited to, the Mitrend® Data Collection

Procedures (written instructions, rules, and processes for data collection, including use of the tools), the Mitrend® QuickScripts (interpreted software that executes a series and sequence of commands), the Mitrend® Scanner (compiled software for data collection via system application programming interfaces ("API"), and the Mitrend® Data Analyzer (software for analysis of storage metadata and data reducibility). Second, TSC developed its cloud-based SaaS (software-as-a-service) platform to receive the output of the Mitrend Collection Tools, to analyze such output, and to generate (using report templates) a human-readable report about various aspects of the target IT infrastructure.

12.     TSC has invested substantial time, effort, and resources to develop the Mitrend® Collection Tools, TSC's SaaS platform, and report templates. TSC made significant and continuous investment in the user experience, platform capabilities, scaling and performance of these products and services over more than 10 years. To protect its intellectual property and its investments, TSC has, among other things, obtained copyright and trademark protection.

### TSC's Relationship with EMC

13.     EMC began using TSC's analysis services in 2006. The parties entered into a Master Services Partner Agreement on or about March 2, 2006 (the "MSPA"), and subsequently entered into various amendments and statements of work ("SOWs") relating to the products and services that TSC provided to EMC.

14.     In the early stages of the parties' relationship, TSC would receive information gathered from EMC's target customers' IT infrastructure using EMC's collection software. TSC personnel would analyze and interpret that information and provide a report summarizing the target customer's IT infrastructure and identify key findings and recommendations. EMC's pre-sales engineers would receive the report and use it as a sales aid with their target customers.

15.     At this time, the industry (which included EMC) had no lightweight data collection tools, instead relying on software developed for other purposes that were ill-suited for sales purposes. Such software required lengthy setup procedures and required installation on the target customers' premises, which took significant time and resources, including security reviews, validation, training, professional services, and other complexities. Further, once this data collection software was installed and configured, the target customer would then have to leave it in place for weeks to gather the requisite information prior to analysis.

16.     The cumbersome – and slow – data collection software generally used by the industry at the time (which also included EMC's software) meant that technology companies (including EMC) had limited ability to sell (or upsell) products and services to the IT departments of target customers.

17.     TSC's vision and approach, which it conceived of independently from EMC, was different than the prevailing one in industry at the time: an automated and accelerated process that could be completed in minutes to hours, rather than weeks to months.

18.     TSC began its own significant development of its new Mitrend® platform in 2006. This included devoting substantial time, effort, and resources to develop and (and later enhance) the Mitrend Collection Tools, TSC's SaaS platform, and the processes, rules, logic and design that generated the Mitrend® assessment reports (collectively, the "report templates").

19.     The Mitrend® service was (and is) one that can be easily run on computers in an IT infrastructure environment to rapidly collect information about those computers and receive insight into the current state, challenges, and requirements of the environment.

20.      In independently developing the Mitrend Collection Tools, TSC's SaaS platform, and report templates, TSC's leveraged new practices and technologies, including cloud services

and "Web 2.0" technologies, to shift the burden of analysis to a more modern architecture. TSC named its simplified collection software (which are part of the Mitrend Collection Tools) "QuickScripts" to emphasize the speed and ease at which they could be run – and to distinguish them from complex, installed software applications that were slow and cumbersome (such as prior versions of EMC's collection tools).

21.     The elegance of TSC's innovative solution – with the Mitrend® QuickScripts at its core – was that it eliminated weeks from the sales cycle of TSC's customers (which included EMC), and was the foundation of TSC's customers' assessment service.

22.     TSC developed and marketed its Mitrend Collection Tools independently from EMC. EMC initially declined to use them, in favor of EMC's old collection software. However, EMC soon recognized that the Mitrend Collection Tools were superior for its sales process than EMC's other software and started using them.

23.     Although Mitrend Collection Tools were first used by EMC's Data Protection business unit and sales organization, other EMC business units took notice. TSC's business quickly expanded with EMC, with a growing set of Mitrend Collection Tools that were used by EMC's Servers, Storage, and Applications Business Units.

24.     Upon information and belief, the Mitrend Collection Tools rapidly became the best, and primary, data collection and analysis solution that EMC's sales engineers, resellers, associates, partners, and technical teams within EMC used as a sales aid to sell (or upsell) products and services to customer IT departments.

25.     Upon information and belief, TSC's products and services, which included the Mitrend Collection Tools, became an integral part of EMC's sales strategy across multiple business units and were included in EMC sales training.

26.     In fact, upon information and belief, within three years of EMC using the Mitrend Collection Tools, the relevant EMC business units abandoned EMC's collection tools to support their sales efforts, and nearly exclusively used the Mitrend Collection Tools for this purpose.

27.     Upon information and belief, the speed, ease of use, and accuracy of the Mitrend Collection Tools, along with the effectiveness of the Mitrend® reports, were critical information that EMC's sales team used in selling and upselling products and services.  Accordingly, upon information and belief, the Mitrend Collection Tools (with the Mitrend® QuickScripts at the heart) drove significant revenue for EMC, as such tools became the cornerstone of the company's sales efforts for multiple business units, provided a "foothold" at the customer for other business units, was supported by top EMC sales executives, and became part of EMC's standard sales training and sales workflow.

28.     Within a four year period, EMC's relationship with TSC grew dramatically – from several hundred thousand dollars a year, to several million dollars a year.  During this time, TSC invested significant engineering time, money, and effort to anticipate market opportunities, develop, enhance, improve, and enhance its "scripts," instructions, and processes (which included the Mitrend Collection Tools).

29.     Upon information and belief, at times during the parties' relationship, EMC considered independently developing its own solution to replace TSC's Mitrend® service (which included the Mitrend Collection Tools) but did not do so because, at least in part, the cost and effort required was too high.

30.     Throughout the entirety of the parties' relationship, TSC's primary contacts with EMC were with employees located in Massachusetts.

**The Parties' Agreements**

31.     On or about April 7, 2009, the parties entered into a SOW under the MSPA (which is "Attachment A" to the MSPA) that formalized EMC's prior use of, among other things, the Mitrend Collection Tools.  That SOW provided, in part, that all of the software and templates that TSC developed (or would develop in the future) are TSC's property, are "proprietary" to TSC, that TSC also owned all derivative works therefrom, and that changes to the software, rules, formulae, methodologies and the like or upon which such software is based are also proprietary to TSC.  Thus, the MSPA acknowledged TSC's ownership of (and EMC's limited license to), at least, the Mitrend Collection Tools, and all derivative works thereof.

32.     The same day (April 7, 2009), the parties also entered into a Master Software License and Services Agreement ("MSLA").  The MSLA granted EMC a non-exclusive and enterprise-wide license to use the Mitrend Collection Tools for its internal purposes, and to allow EMC to provide them to its customers to run and collect information on their IT infrastructure.

33.     The MSLA (and subsequent amendments) prohibited EMC from disassembling, reverse engineering, or reverse compiling the licensed software (which included the Mitrend Collection Tools) and also prohibited EMC from removing or altering any copyright notices (or other similar notices) in any copies of the licensed software EMC made.  It also required EMC, at the end of the license period, to destroy or return all copies of the materials it licensed and received from TSC.

34.     Exhibit A to the MSLA specifically identified the "scripts" that constituted the licensed software (*e.g.,* Mitrend® QuickScripts that are part of the Mitrend Collection Tools).  It had the same scope of use as the 2009 SOW, made clear that the license grant was not perpetual, and that, upon termination of the license, EMC was required to destroy or return the licensed

software.  The scope of the license was subsequently expanded (in written agreements) in later years to include "data protection" and "storage" assessments – and the corresponding Mitrend Collection Tools necessary to provide those assessments.

35.     In 2015, the parties entered into another SOW to the MSPA, which had a "commencement date" of April 1, 2015.  That SOW, which replaced prior ones, expanded the scope of products and services (and the corresponding license) that TSC provided to EMC. Among other things, that SOW stated that it was TSC's responsibility to "provide and maintain" the "collection tools" (which include, but are not limited to, the Mitrend Collection Tools).  It also provided that, notwithstanding anything provided for in parties' prior agreements, all software (which included, but was not limited to, Mitrend® QuickScripts, Mitrend® Scanner, and Mitrend® Analyzer) and templates solely developed by TSC are TSC's property, that all derivative works based on earlier versions of such software are TSC's property, and that all changes to such software, rules, formulae, methodologies or the like upon which the software is based are also TSC's property.   The 2015 SOW also stated that the parties were not to conduct any joint development work, unless they entered into a separate agreement.

36.     All of the Mitrend Collection Tools, and written procedures, rules, and instructions that were provided to EMC contained or pointed to a copyright protection notice, identifying TSC as the owner of such material.  The Mitrend® Data Collection Procedures were available on TSC's website (for registered users, which included EMC and its customers), whose terms of use included copyright provisions.

### The Wind-Down of the Parties' Relationship

37.     The relationship between TSC and EMC was productive, and strong, until 2016. During this time, TSC and EMC had active lines of communication, including a dedicated EMC

project manager who provided regular status updates and identified any outstanding issues. TSC provided regular service updates, including enhancements and fixes. TSC participated in product review and communication with EMC's support teams to ensure all issues were satisfactorily resolved.

38. Shortly after Dell Inc. acquired EMC and created Dell Technologies Inc. (which, upon information and belief, became the parent corporation of EMC) in or about the fall of 2016, things began to change.

39. Throughout 2016, including post-acquisition 2016 (the acquisition closed, upon information and belief, on September 7, 2016) and as late as December, 2016, TSC was repeatedly informed of EMC's[1] intent to continue the relationship for the upcoming 2017-2018 period.

40. Then, in early January, 2017, EMC unexpectedly informed TSC that it would require new contract terms that included: (1) changing TSC to a contractor status (rather than a "partner"); (2) TSC transferring ownership of its intellectual property to EMC (rather than continue to own and license it); (3) allowing EMC to do what it wanted with that intellectual property; and (4) allowing EMC to subsume the Mitrend® brand into its own yet-to-be-determined brand. EMC's unexpected demands were made with little time to negotiate, as the MSPA would automatically renew on March 2, 2017 and the SOW needed to be extended by April 1, 2017.

41. Upon information and belief, the timing of EMC's sudden demands (which were shortly before the automatic renewal of the MSPA and the expiration of the SOW) were intentional and used as a tactic to pressure TSC to acquiesce. Upon information and belief, EMC

---

[1] For consistency, the Second Amended Complaint refers to all defendants as "EMC" post-acquisition, but the use of that term is meant also to include Dell Technologies Inc. and Dell. Inc.

made these unreasonable demands because it believed that TSC had no choice but to agree, as EMC constituted TSC's largest customer and was a substantial portion of its revenue.

42.     TSC informed EMC that could not agree to these changes, and provided EMC with a notice of termination on January 10, 2017, stating that termination of the MSPA would be effective as of March 2, 2017.  The notice of termination further advised EMC that, pursuant to the SOW of April 1, 2015, TSC would continue to provide its products and services (and a software license) to EMC until the expiration of that SOW on April 1, 2017.  TSC nevertheless indicated its willingness to negotiate.

43.     Upon information and belief, TSC's decision to terminate the parties' agreements was not something that EMC expected or that it had prepared for (meaning that, at the time of the termination notice, EMC did not have any viable replacement option for the Mitrend® platform).

44.     In response to TSC's termination notice, EMC demanded TSC agree to an extension of the parties' agreements.  In insisting that TSC give it an extension on short notice, EMC used the unequal bargaining power of the parties, and aggressively – and falsely – stated that TSC was in breach of its legal obligations and therefore must enter into such an extension to avoid further disputes.

45.     In response to EMC's undue pressure and threats, TSC acquiesced to EMC's demands and agreed to continue to provide its products and services (and a license to its software) on a month-to-month basis after the April 1, 2017 expiration of the SOW, and even allowed EMC to elect monthly extensions for a limited period of time.

46.     The parties negotiated for several months, and then entered into a Wind-Down of Master Services Agreement (the "Wind-Down Agreement"), which formalized the extension of

the parties' agreements until November 16, 2017 and also contained additional provisions which supplemented and/or superseded the parties' prior agreements. The parties later entered into a two week extension of the Wind-Down Agreement, which expired on November 30, 2017.

47. Among other things, the Wind-Down Agreement specifies certain "EMC property" to which TSC disclaimed any ownership rights (and EMC demanded ownership rights to). The Mitrend Collection Tools, TSC's report templates, and TSC's other instructions, processes, and rules were not among the items listed or identified as EMC's property.

48. The Wind-Down Agreement also contains a provision which required EMC to return or destroy all instances of software (*e.g.,* the Mitrend Collection Tools) or content that TSC provided EMC, other than the reports that TSC generated for EMC during the course of the parties' relationship. In addition, the Wind-Down Agreement specified that neither party has any license, implied or express, to use the other parties' intellectual property. As such, EMC after the expiration of the Wind-Down Agreement, no longer had a license to use TSC's software and intellectual property (which included, but was not limited to, the Mitrend Collection Tools – and all derivative works thereof).

49. The Wind-Down Agreement also provided that there was no limitation on the remedies or damages available for a party's breach of the Wind-Down Agreement, and that any such limitations in the parties' prior agreements did not change this.

50. The parties agreed that Massachusetts shall be the forum and venue for any litigation arising under, or in connection with, the Wind-Down Agreement. Similar forum selection and choice of law provisions were also in the MSPA, the MSLA, and the parties' related agreements.

**EMC'S Infringement of TSC's Copyrights and Intellectual Property**

51.     Around the time the parties' relationship ended, EMC announced the launch of a competitive product – which it called Live Optics – to compete with TSC's Mitrend® platform.

52.     At the time, EMC claimed that Live Optics was "100% [EMC] IP."  EMC also stated that it was giving Live Optics away for "free" as a "donation to the industry."   It later claimed that "[n]othing is going away.  It's actually just a rebranded experience."

53.     Upon information and belief, the real reason EMC insisted that TSC agree to extend the parties' agreement beyond April 1, 2017 – including entering into the Wind Down Agreement – was to allow EMC the additional time needed to develop, test, and deploy Live Optics in secret.   Upon information and belief, EMC insisted on this lengthy extension to prevent TSC's Mitrend® platform from having any "time to market" advantage over Live Optics.

54.     EMC's Live Optics product is (and was), upon information and belief, intended to do the same thing that the Mitrend® platform did – provide EMC's sales team with a powerful tool to sell (or upsell) products and services to existing and potential customers.  Upon information and belief, EMC intended its Live Optics offering to be used in the same way – and for the same ends – as it had used the Mitrend® platform in general and the Mitrend Collection Tools in particular.

55.     EMC also, upon information and belief, provided assistance, instruction, and encouragement to such third parties to copy, use, display, and/or publish its Live Optics products (software, written processes, and written instructions).  Upon information and belief, EMC did so with the intention that such third parties copy, use, display, and/or publish Live Optics and, among other things, the associated software, written processes, and written instructions.

56.     At the end of June, 2019, a third party who was using the Mitrend Collection Tools approached TSC because it observed similarities between certain of the Mitrend Collection Tools it had in its possession and certain of the scripts from EMC's Live Optics product that it had received from EMC. Upon information and belief, this third party was confused as to why two competitors (EMC and TSC) were using the same scripts.

57.     The third party sent TSC a side-by-side comparison of one script from Live Optics that it received from EMC and the corresponding Mitrend® QuickScript (part of the Mitrend Collection Tools). This side-by-side comparison revealed the nature and extent of EMC's unlawful use of the particular Mitrend Collection Tool.

58.     Upon information and belief, EMC provides and distributes its Live Optics product via a .zip file (either downloadable from a web site or otherwise) to its customers, resellers, distributors, associates, vendors, partners, and/or other third parties. Upon information and belief, such .zip file contains (and contained) Live Optics scripts for the UNIX and Windows versions of NetWorker, NetBackup, and Tivoli Storage Manager ("TSM") (individually and collectively, the "Infringing Live Optics Collection Tools"). Upon information and belief, the Infringing Live Optics Collection Tools are the only scripts contained in the aforementioned .zip file.

59.     Upon information and belief, EMC provides and distributes the aforementioned .zip file, along with written instructions and procedures on how to use the aforementioned scripts, in commerce in Massachusetts and in interstate commerce (as well as internationally).

**TSC's Copyrighted Works**

60.     TSC developed the content, owns copyrights, and has obtained the following copyright registrations issued by the United States Copyright Office covering the software

written and procedures (collectively, and individually, the "Copyrighted Mitrend Collection Tools"), as listed below:

| Company | Product | Registration Date | Registration Number |
|---|---|---|---|
| Timmins Software Corporation | Mitrend NetBackup Collection Script for Unix | August 22, 2019 | TX 8-765-505 |
| Timmins Software Corporation | Mitrend NetBackup Collection Script for Unix | January 28, 2020 | TX 8-848-434 |
| Timmins Software Corporation | Mitrend NetBackup Collection Script for Unix | January 28, 2020 | TX 8-869-534 |
| Timmins Software Corporation | Mitrend NetBackup Collection Script for Unix | January 28, 2020 | TX 8-849-958 |
| Timmins Software Corporation | Mitrend NetBackup Collection Script for Windows | August 22, 2019 | TX 8-765-493 |
| Timmins Software Corporation | Mitrend NetBackup Collection Script for Windows | January 30, 2020 | TX 8-853-875 |
| Timmins Software Corporation | Mitrend NetBackup Collection Script for Windows | January 30, 2020 | TX 8-853-879 |
| Timmins Software Corporation | Mitrend NetBackup Collection Script for Windows | January 30, 2020 | TX 8-851-833 |
| Timmins Software Corporation | Mitrend NetWorker Collection Script for Unix | August 22, 2019 | TX 8-765-491 |
| Timmins Software Corporation | Mitrend NetWorker Collection Script for Unix | March 18, 2020 | TX-8-855-235 |
| Timmins Software Corporation | Mitrend NetWorker Collection Script for Unix | February 3, 2020 | TX 8-854-008 |
| Timmins Software Corporation | Mitrend NetWorker Collection Script for Unix | February 3, 2020 | TX 8 855-744 |
| Timmins Software Corporation | Mitrend NetWorker Collection Script for Windows | August 22, 2019 | TX 8-765-489 |
| Timmins Software Corporation | Mitrend NetWorker Collection Script for Windows | February 3, 2020 | TX 8-855-243 |

| | | | |
|---|---|---|---|
| Timmins Software Corporation | Mitrend NetWorker Collection Script for Windows | February 3, 2020 | TX 8-854-773 |
| Timmins Software Corporation | Mitrend TSM Collection Script for Unix | August 22, 2019 | TX 8-765-580 |
| Timmins Software Corporation | Mitrend TSM Collection Script for Unix | July 24, 2020 | TX 8-899-931 |
| Timmins Software Corporation | Mitrend TSM Collection Script for Unix | August 10, 2020 | TX 8-887-876 |
| Timmins Software Corporation | Mitrend TSM Collection Script for Windows | August 22, 2019 | TX 8-765-563 |
| Timmins Software Corporation | Mitrend TSM Collection Script for Windows | February 7, 2020 | TX 8-867-432 |
| Timmins Software Corporation | Mitrend Data Collection Procedure for Netbackup | August 28, 2020 | TX 8-894-693 |
| Timmins Software Corporation | Mitrend Data Collection Procedure for Networker | August 28, 2020 | TX 8-896-249 |
| Timmins Software Corporation | Mitrend Data Collection Procedure for TSM | August 28, 2020 | TX 8-896-092 |
| Timmins Software Corporation | Mitrend Data Collection Procedure for VNX | August 28, 2020 | TX 8-894-673 |
| Timmins Software Corporation | Mitrend Data Collection Procedure for Veeam | August 28, 2020 | TX 8-896-095 |
| Timmins Software Corporation | Mitrend Data Collection Procedure for Commvault | August 28, 2020 | TX 8-896-252 |
| Timmins Software Corporation | Mitrend Data Collection Procedure for Avamar | August 28, 2020 | TX 8-896-094 |
| Timmins Software Corporation | Mitrend Data Collection Procedures | August 22, 2019 | TX-8-765-805 |
| Timmins Software Corporation | Mitrend Data Collection Procedures | August 28, 2020 | TX 8-893-695 |

61. Copies of each of the aforementioned registration certificates, which are valid and wholly owned by Plaintiff, are attached as Exhibits 1-29 hereto.

62.     The Copyrighted Mitrend Collection Tools are wholly original, were solely developed by TSC, and TSC exclusively owns any and all rights, title and interest, including all right under copyright, in each of the Copyrighted Mitrend Collection Tools.

63.     As described above, EMC had the opportunity to copy the Copyrighted Mitrend Collection Tools.

64.     Comparisons of each of the Copyrighted Mitrend Collection Tools with the Infringing Live Optics Collection Tools demonstrates that EMC copied large portions of the Copyrighted Mitrend Collection Tools, including arbitrary programmers' decisions (including, but not limited to, names of output files, the order of output files, and command line key words) and the structure of the Copyrighted Mitrend Collection Tools, such that the Infringing Live Optics Collection Tools are copies of and/or derived from the Copyrighted Mitrend Collection Tools.

65.     TSC believes that discovery will show that earlier versions of EMC's Live Optics products contained additional or other unlawful use of, at least, the Copyrighted Mitrend Collection Tools, and reserves the right to add such instances as additional grounds in this action. Upon information and belief, EMC's infringements have continued to expand, with infringements as old as 2017 and as new as 2019.

66.     A comparison of the Copyrighted Mitrend Collection Tools with the Infringing Live Optics Collection Tools reveals that EMC removed TSC's copyright notices and replaced them with its own copyright notices.

67.     In addition, comparisons of the copyrighted Mitrend Data Collection Procedures (TX 8-894-693, TX 8-896-249, TX 8-896-092, TX 8-896-673, TX 8-896-095, TX 8-896-252, TX 8-896-094, TX 8-765-805, and TX 8-893-695) with the written instructions and procedures

that EMC provides for, at least, eight different Live Optics services (NetBackup, NetWorker, TSM, VNX, CommVault, Hitachi, Avamar and Veeam) (individually and collectively, the "Infringing Data Collection Procedures") demonstrate that EMC copied large portions of and the structure of the copyrighted Mitrend Data Collection Procedures, such that the Infringing Data Collection Procedures are copies of and/or derived from the Mitrend Data Collection Procedures (which are part of the Copyrighted Mitrend Collection Tools).

68. TSC believes that discovery will show that other Live Optics written instructions or procedures contain additional or other unlawful use of the aforementioned copyrighted Mitrend Data Collection Procedures, and reserves the right to add such instances as additional grounds in this action.

69. EMC's use of portions of the Copyrighted Mitrend Collection Tools is without TSC's authorization, consent or knowledge and without providing any compensation to TSC for use of the Copyrighted Mitrend Collection Tools.

70. Upon information and belief, EMC's copying and exploitation of the Copyrighted Mitrend Collection Tools was (and is) willful, in disregard of, and indifference to the TSC's rights.

71. Upon information and belief, EMC willful and intentional conduct was (and is) committed to financially benefit from the Copyrighted Mitrend Collection Tools

72. TSC is the exclusive owner and author of additional copyright registrations relating to the Mitrend Collection Tools. If discovery reveals that EMC is infringing (or has infringed) these additional copyright registrations, TSC reserves the right to add such instances as additional grounds in this action.

73. TSC is in the process of obtaining copyright registrations on additional aspects of

the Mitrend Collection Tools, earlier versions of the Copyrighted Mitrend Collection Tools, and additional material relating to the Mitrend® platform's written instructions, rules, and procedures. Once those copyrights are registered, if discovery reveals that EMC infringed (or is infringing) any of the material in those registrations, TSC reserves the right to add them to this action as additional grounds.

74. TSC also believes that discovery will reveal other aspects of TSC's Mitrend® data collection software, rules, and processes that were used or copied without permission or authority; improper use of TSC's templates; forbidden reverse engineering TSC's software; and copying the functionality, user interface, and other aspects of TSC's software. If discovery reveals that EMC improperly used any such information, TSC reserves the right to add those instances to this action as additional grounds.

75. Upon information and belief, EMC has been (and is) providing its Live Optics product, including but not limited to the Infringing Live Optics Collection Tools and/or the Infringing Data Collection Procedures to its customers (actual and potential) for them to run on their IT infrastructure. Upon information and belief, EMC is then taking the output from those scripts (including the Infringing Live Optics Collection Tools and/or the Infringing Live Optics Collection Tools), analyzing it, and (via templates) creating reports for use in its sales process.

76. Upon information and belief, EMC is also providing such information, including but not limited to the Infringing Live Optics Collection Tools and/or the Infringing Live Optics Collection Tools to its resellers, distributors, associates, vendors, partners, and/or other third parties, along with written instructions and procedures, on how to use such materials. Upon information and belief, EMC (or its resellers, associates, vendors, distributors, and partners) then takes the collected data, analyzes it, and prepares a report that is used to sell (or upsell) products

and services.

77.     Upon information and belief, EMC has used, and is using, the Infringing Live Optics Collection Tools and/or the Infringing Live Optics Collection Tools on a large scale with its customers, resellers, distributors, vendors, partners, associates, and other third parties.

78.     Even though the parties' relationship is over, and EMC no longer has a license to use or deploy the Mitrend® platform, EMC's public materials still contain information about the Mitrend® platform, and EMC even instructs third parties how to use it.  *See, e.g.*, https://community.emc.com/docs/DOC-62295.  Even more egregiously, according to such material, it was first posted in the last week of the parties' relationship and was "updated" after the end of the parties' relationship.  (*Id.*)

79.     EMC's ongoing and widespread infringement has had a significant impact on the Mitrend business.  Among other things, TSC lost direct licensing revenue from EMC, indirect revenue in the form of subscribers and users, and lost sales momentum due to EMC's improper actions.  EMC's unlawful actions also forced TSC to lay off a significant portion of its staff in 2017, while refocusing its business to new markets.

80.     As a result of EMC's actions described above, TSC has been damaged and is continuing to be damaged by the unauthorized copying, use, and distribution of the Copyrighted Mitrend Collection Tools.  EMC has never accounted for or otherwise paid TSC for using the Copyrighted Mitrend Collection Tools after the expiration of the Wind-Down Agreement.

81.     EMC's conduct is causing, and will continue to cause, irreparable harm to TSC for which there is no adequate remedy at law.

<u>**COUNT I**</u>
<u>**(Direct Copyright Infringement)**</u>

82.     Plaintiff repeats and realleges the allegations in paragraphs 1-81 above as if fully

20

set forth herein.

83. The Copyrighted Mitrend Collection Tools are original works of software and written instructions and procedures, as described above.

84. Plaintiff is the exclusive author and owner of the Copyrighted Mitrend Collection Tools, as set forth in paragraphs 60-62, above. Plaintiff holds valid copyright registration from the U.S. Copyright Office for the Copyrighted Mitrend Collection Tools. The copyright registrations are identified, dated, and numbered in Exhibits 1-29, attached hereto.

85. Defendants had access to Plaintiffs' Copyrighted Mitrend Collection Tools.

86. Through the acts alleged above, Defendants were engaged and are engaging in acts of direct copyright infringement by using, reproducing, distributing, creating derivative works from, displaying, importing/exporting, and/or publicly displaying any of Plaintiff's registered copyrights in violation of Section 501 of the Copyright Act, 17 U.S.C. § 501. In particular, at least Defendants' Infringing Live Optics Collection Tools and/or Infringing Data Collection Procedures directly infringe Plaintiff's registered copyrights in, at least, the Copyrighted Mitrend Collection Tools.

87. Defendants do not have authorization, license, or permission from Plaintiff to reproduce, distribute, display, create derivative works from, import/export, publicly display, use, adapt, advertise, promote, or offer any of Plaintiff's Copyrighted Mitrend Collection Tools.

88. Upon information and belief, Defendants' infringing conduct is and continues to be willful and with knowledge that Plaintiff had rights in the Copyrighted Mitrend Collection Tools.

89. As a result of Defendants' infringing conduct, Plaintiff has been and will continue to be harmed. Plaintiff is entitled to an injunction restraining Defendants and their officers,

agents, and employees, and all persons acting in concert with them, from engaging in any further such acts in violation of the copyright laws.

90.     Plaintiff is further entitled to recover damages from Defendants as a result of Defendants' infringing conduct including, but not limited to, any gains, profits or advantages obtained by Defendants relating to their acts of infringement alleged above.  Among other things, Plaintiff is entitled to recover actual damages it has suffered, Defendants' profits that are attributable to the infringement, and all other damages to which it is entitled to under 17 U.S.C. § 504.  At present, Plaintiff cannot ascertain the amount of such damages, gains, profits, and advantages.

## COUNT II
## (Contributory Copyright Infringement)

91.     Plaintiff repeats and realleges the allegations in paragraphs 1-90 above as if fully set forth herein.

92.     Defendants induced, caused, and materially contributed to the infringing acts of others (and are continuing to do so) by encouraging, inducing, allowing, and assisting customers, third party resellers, distributors, vendors, partners, affiliates, associates, and/or other third parties to reproduce, distribute, display, create derivative works from, import/export, publicly display, use, adapt, advertise, promote, or offer, at least, the Infringing Live Optics Collection Tools and/or the Infringing Data Collection Procedures (which infringe, at least, Plaintiff's Copyrighted Mitrend Collection Tools).

93.     Defendants had knowledge of the infringing acts relating to, at least, Plaintiff's Copyrighted Mitrend Collection Tools.

94.     The acts and conduct of the Defendants, as alleged herein, constitutes contributory copyright infringement.

95. Plaintiff is entitled to an injunction restraining Defendants and their officers, agents, and employees, and all persons acting in concert with them, from engaging in any further such acts in violation of the copyright laws.

96. Plaintiff is further entitled to recover damages from Defendants the damages it has sustained as a result of Defendants' contributorily infringing conduct including, but not limited to, any gains, profits or advantages obtained by Defendants relating to acts of infringement alleged above. Among other things, Plaintiff is entitled to recover actual damages it has suffered, Defendants' profits that are attributable to the infringement, and all other damages to which it is entitled to under 17 U.S.C. § 504. At present, Plaintiff cannot ascertain the type and amount of such damages, gains, profits, and advantages.

## COUNT III
### (Alteration or Removal of Copyright Management Information)

97. Plaintiff repeats and realleges the allegations in paragraphs 1-96 above as if fully set forth herein

98. Each of the Plaintiff's Mitrend Collection Tools, including but not limited to the Copyrighted Mitrend Collection Tools, and all of the written instructions, and procedures that were provided to Defendants contained or pointed to copyright notices identifying Plaintiff as the owner of its original and protected copyright material.

99. The inclusion of a copyright notice, including the identity of the Plaintiff, constitutes "copyright management information" as defined in 17 U.S.C. § 1202(c).

100. Defendants, without authority of Plaintiff or the law, intentionally removed and/or altered and have caused and induced others to remove and/or alter such copyright management information from Plaintiff's subject works, and have thereafter distributed the improperly modified works, having reasonable grounds to know that such acts will constitute, induce,

23

enable, facilitate, or conceal an infringement of a copyright in violation of 17 U.S.C. §1202(b).

101.    Defendants' removal or alteration of copyright management information from Plaintiff's subject works, and their subsequent distribution of the improperly modified works was, and is, willful and intentional and was, and is, executed with full knowledge of Plaintiff's rights under copyright law, in and in disregard of Plaintiff's rights.

102.    Plaintiff is entitled to recover its actual damages suffered as a result of the violation and any gains or profits of Defendants attributable to the violation not taken into account in computing actual damages, or, at Plaintiff's election, statutory damages pursuant to 17 U.S.C. § 1203(c).  At present, Plaintiff cannot ascertain the type and amount of such damages, gains, profits, and advantages.

103.    Plaintiff is entitled to recover costs and attorneys' fees from Defendants pursuant to 17 U.S.C. § 1203(b).

104.    Defendants' violations of 17 U.S.C. § 1202(b) have caused and, unless restrained by this Court, will cause irreparable injury to Plaintiff not fully compensable in monetary damages.  Pursuant to 17 U.S.C. § 1203(b)(1), Plaintiff is entitled to injunctive relief enjoining Defendants from any further such violations.

**COUNT IV**
**(Unjust Enrichment)**

105.    Plaintiff repeats and realleges allegations in paragraphs 1-104 above as if fully set forth herein.

106.    Defendants have unlawfully received benefits from their unauthorized infringement of Plaintiff's original Mitrend Collection Tools material, including but not limited to the Copyrighted Mitrend Collection Tools, as well as all other software, scripts, written instructions and procedures, and other material that Plaintiff provided to Defendants.

107.     Defendants have accepted and retained the benefits of knowing that their conduct was unjust and that retaining the benefits was inequitable.

108.     Defendants have been, and continue to be, unjustly enriched by retaining the benefits that they have received as a result of their improper conduct.

109.     As a result of Defendants' improper actions, Plaintiff has suffered damages in an amount and type to be proven at trial.

### COUNT V
### (Breach of Contract)

110.     Plaintiff repeats and realleges the allegations in paragraphs 1-109 above as if fully set forth herein.

111.     Defendants voluntarily entered into the MSPA, MSLA (and various amendments and additions to those agreements), SOWs, and the Wind-Down Agreement.  Defendants received substantial benefits from those agreements, including obtaining a license to Plaintiff's intellectual property.

112.     The April, 2009 SOW (Attachment A to the MSPA) states that all software and materials, which include (but are not limited to) the Mitrend Collection Tools, are the property of Plaintiff and can only be used by EMC during the term of the license agreement and under the terms of the parties' statements of work.  That provision also extends Plaintiff's ownership to derivative works based on, among other things, the Mitrend Collection Tools.  EMC also agreed that any collection tools it would use in the future only would be EMC's property if they constitute work solely of EMC, not joint work.  The parties' most recent SOW made clear that all software and templates developed by Plaintiff, and all derivative works therefrom, are the property of Plaintiff.  *See, e.g.,* SOW for Data Protection and Product Protection Analysis to the MSPA, § 4.2 (commencement date April 1, 2015).

113.     Section 1.1.1 of Exhibit A to the MSLA states that EMC shall not reverse engineer or reverse compile the software it licensed from TSC, which includes (but is not limited to) the Mitrend Collection Tools and only use such software as permitted under the license. Section 5.4 states that the license granted was not perpetual and that, upon termination, EMC shall destroy or return all copies of the licensed software. Other, later, amendments to the MPLA had the same (or similar) requirements. *See also, e.g.,* MPLA, Ex. A-1, §§ 1.1.1, 5.4; *id.* at Ex. A-2 §§ 1.1.1, 5.4

114.     Section 11.6 of the Wind-Down Agreement required EMC to return or destroy Plaintiff's software and content provided to EMC, which included but is not limited to the Mitrend Collection Tools, and associated instructions and procedures, at the conclusion of the Wind-Down Agreement. Section 11.9 also made clear that EMC has no implied license to use Plaintiff's intellectual property, which includes (but is not limited to) the Mitrend Collection Tools, templates, and associated instructions and procedures.

115.     The Wind-Down Agreement terminated on November 30, 2017, and with it the MSPA, MSLA and all other of the parties' agreements (although the surviving provisions and obligations continued).

116.     Upon information and belief, Defendants did not return or destroy Plaintiff's intellectual property, which includes but is not limited to the Mitrend Collection Tools, and associated instructions and procedures in violation of, at least, the aforementioned contractual provisions and Defendants' contractual obligations.

117.     Upon information and belief, Defendants have continued to use, distribute, and offer Plaintiff's intellectual property, which includes but is not limited to the Mitrend Collection Tools, templates, and associated instructions and procedures without any license from TSC.

118. Upon information and belief, Defendants used, reverse engineered and/or compiled Plaintiff's intellectual property, which includes but is not limited to the Mitrend Collection Tools templates, and associated instructions and procedures, in violation of, at least, the aforementioned contractual provisions and Defendants' contractual obligations.

119. Defendants' conduct constitutes a breach of, at least, the aforementioned contractual provisions.

120. As a result of Defendants' breaches, Plaintiff has suffered damages in an amount and type to be proven at trial.

## COUNT VI
### (Unfair Competition Under 15 U.S.C. § 1125(a))

121. Plaintiff repeats and realleges the allegations in paragraphs 1-120 above as if fully set forth herein.

122. Defendants' unauthorized uses, including but not limited to, its intentional and blatant infringement of the Mitrend Collection Tools and/or the Mitrend Data Collection Procedures, its false statements about Live Optics (*e.g.,* that it is "100% [EMC] IP" and "[n]othing is going away. It's actually just a rebranded experience"), its current and continuing references to the Mitrend® platform in its public-facing documentation, the copying of the basic elements of the Mitrend® platform are likely to deceive consumers as to consumers as to the origin, source sponsorship, or affiliation of Defendants' products and services.

123. Defendants' unauthorized use in interstate commerce constitutes false designation of origin and passing off in connection with its Live Optics products and services, in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

124. Defendants' unauthorized uses in commerce are likely to deceive consumers as to the origin, source, and/or sponsorship of their Live Optics product.

27

125.     Defendants' conduct, as described herein, also constitutes unfair competition in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

126.     Defendants' acts and conduct have caused irreparable injury to Plaintiff's goodwill and reputation.  The injury to Plaintiff is, and continues to be, ongoing and irreparable and, unless enjoined, will continue to cause a likelihood of confusion and deception of members of the trade and public, and will cause injury to TSC's goodwill and reputation.  An award of monetary damages alone cannot fully compensate Plaintiff for its injuries.  Plaintiff is entitled to injunctive relief against Defendants, pursuant to § 34 of the Lanham Act, 15 U.S.C. § 1116.

127.     Because Defendants actions were (and are) willful and intentional, Plaintiffs are entitled to attorneys' fees pursuant to 15 U.S.C. § 1117.

128.     Plaintiff is also entitled to Defendants' profits and Plaintiff's damages, trebled, and to reasonable attorneys' fees and costs,

**COUNT VII**
**(Unfair Trade Practices Under Massachusetts General Law Chapter 93A)**

129.     Plaintiff repeats and realleges the allegations in paragraphs 1-128 above as if fully set forth herein.

130.     At all relevant times, Plaintiff and Defendants were engaged in trade or commerce within the meaning of Massachusetts General Laws c. 93A, §§ 1 and 11.  For example, Plaintiff and Defendants engaged in trade and business relating to the Mitrend® platform, entered into the aforementioned agreements, and had the aforementioned interactions in the Commonwealth.

131.     Defendants have engaged in unfair acts and practices and used unfair methods of competition within the meaning of Massachusetts General Laws c. 93A.  For example, and without limitation, Defendants improperly pressured TSC to agree to unreasonable contract terms, used knowingly false accusations and leveraged the parties' unequal bargaining power to

force TSC to agree to an extension of the parties' agreement and then used that extension to buy time and retain access to the Mitrend® platform to develop EMC's Live Optics product, and falsely – and misleadingly – claimed that its Live Optics product is "100% [EMC] IP" and that "Nothing is going away.  It's actually just a rebranded experience."

132.    Defendants' unfair or deceptive acts or trade practices occurred primarily and substantially in Massachusetts.  For example, and without limitation, Defendants' unfair or deceptive acts have been committed, received, and acted upon in Massachusetts, where both TSC and EMC reside and do business.

133.    The Defendants' unlawful actions as described herein were intentional, willful, and knowing.  These actions were immoral, unethical, oppressive, and/or unscrupulous.

134.    As a direct and proximate result of the foregoing unfair or deceptive practices of Defendants, Plaintiff has suffered (and continues to suffer) significant harm in the form of lost profits or property, and lost sales momentum due to EMC's improper actions, loss of goodwill, and damage to its reputation.  Defendants' improper actions also forced TSC to lay off a significant portion of its staff in 2017 and to refocus its business to new markets.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a jury trial on all claims herein so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests this Court enter judgment in its favor as follows:

A.    That Defendants have violated Section 501 of the Copyright Act (17 U.S.C. § 501) and infringed, and continue to infringe, Plaintiff's Copyrighted Mitrend Collection Tools;

B. That Defendants have contributorily infringed, and continue to contributorily infringe, Plaintiff's Copyrighted Mitrend Collection Tools;

C. That Defendants removed and/or altered Plaintiff's copyright management information from Plaintiff's Copyrighted Mitrend Collection Tools, and distributed such improperly modified material in violation of 17 U.S.C. § 1202(b);

D. That there is substantial likelihood that Defendants will continue to infringe, or induce infringement of, Plaintiff's copyrights and violate 17 U.S.C. § 1202(b) unless enjoined from doing so;

E. That Defendants, their officers, agents, servants, employees, all parent and subsidiary companies, all assignees and successors in interest and those persons in active concert or participation with Defendants, including Defendants' customers, resellers, distributors, associates, vendors, and partners, be permanently enjoined from: (i) using, performing, manufacturing, importing/exporting, reproducing, distributing, adapting, displaying, advertising, promoting, offering (including but not limited to offering for "free" or for sale) any materials that are substantially similar to any of Plaintiff's registered works, or are copied from or derived from the registered works; and (ii) continuing to violate 17 U.S.C. § 1202(b);

F. That Defendants, their officers, agents, servants, employees, all parent and subsidiary companies, all assignees and successors in interest and those persons in active concert or participation with Defendants, including Defendants' customers, resellers, associates, distributors, vendors, and partners be ordered to destroy or deliver for destruction all materials in their possession, custody or control that Defendants used in connection with their infringing conduct, including without limitation all remaining copies of any products and works that embody, are derived from, and/or reproduce or other copy Plaintiff's registered works, as well as

means for recreating or developing them;

G.     That judgment be entered for Plaintiff and against Defendants for Plaintiff's actual damages, which include, among other things, its lost profits, diminished value of Plaintiff's copyright protected material, and for Defendants' gains, profits, or advantages relating to Defendants' conduct complained of herein in an amount to be determined at trial, including pre-judgment and post judgment interest for Defendants' infringement of Plaintiff's registered copyrights;

H.     That judgment be entered for Plaintiff and against Defendants for statutory damages pursuant to 17 U.S.C. § 1203(c);

I.     That judgment be entered for Plaintiff and against Defendants for costs and attorneys' fees pursuant to 17 U.S.C. § 1203(b)(4) and (5) and/or other applicable law;

J.     That Defendants be required to account for all gains, profits, and advantages derived from their acts complained of herein and/or other violations of the law;

K.     That Defendants have been unjustly enriched by their conduct complained of herein and/or other violations of the law, and that Plaintiff be awarded damages in an amount and type to be proven at trial;

L.     That Defendants breached the MSPA, MSLA, the Wind-Down Agreement, and/or related agreements and that Plaintiff be awarded damages in an amount and type to be proven at trial;

M.     That Plaintiff be awarded enhanced and punitive damages as permitted by law, including Massachusetts General Law Chapter 93A;

N.     That Plaintiff be awarded Defendants' profits and Plaintiff's damages, trebled, and to reasonable attorneys' fees and costs under 15 U.S.C. § 1116(a) and § 1117; and

O.	All such further and additional relief as the Court deems just and proper.

January 15, 2021

PLAINTIFF TIMMINS SOFTWARE
CORPORATION d/b/a MITREND

By its attorneys,

/s/ Benjamin M. Stern
Benjamin M. Stern, MA Bar # 646778
Robert Hover, MA Bar # 685975
Anuj Khetarpal, MA Bar # 679163
VERRILL DANA LLP
One Federal Street
Boston, Massachusetts 02108
(617) 309-2600
bstern@verrill-law.com
rhover@verrill-law.com
akhetarpal@verrill-law.com

Sara Hirshon, MA Bar # 662202
VERRILL DANA LLP
One Portland Square
Union Street
Portland, Maine 04112
(207) 774-4000
shirshon@verrill-law.com

## CERTIFICATE OF SERVICE

I, Benjamin M. Stern, hereby certify that this document filed, on January 15, 2021, through the CM/ECF system will be sent electronically to the registered participants as identified on their respective notices of electronic filing, and that paper copies will be sent to those non-registered participants, if any.

/s/ Benjamin M. Stern
Benjamin M. Stern